All right, Mr. Alwick, whenever you're ready. May it please the Court, good morning. My name is James Alwick, along with Gene Lewis. It's our privilege to represent the Mayor and City Council of Baltimore. With the Court's permission, I will address first the subject of the Court's letter to Council, that is the principle of avoidance of constitutional questions and remedies for breach of contract under state law. I will next address the contract clause questions, starting with the reasonable and necessary test as applied by the District Court, and conclude by discussing the substantial impairment question and the City of Charleston factors set down by this Court. I hope to reserve seven minutes to respond to the Union's appeal and for rebuttal. First, there are clearly state law remedies for breach of contract in Maryland in a context of a pension plan for government employees. There is a well-developed body of law in Maryland that defines the parameters of the government's ability to modify a pension plan or with respect to employees whose rights have vested. Those cases start with the case of Saxton v. Board of Trustees in 1972, followed by the City of Frederick v. Quinn in 1977 and Davis v. Annapolis in 1993. And the cases have been followed and augmented by District Court decisions in Maryland, such as Hughes and Baker, which themselves have then been cited by the state courts in developing this area of the law. So the cases provide clear guidance on the extent of a local government's – how much a local government can modify their pension plans consistent with the reserved legislative power to make reasonable modifications to the plan. We argue to Judge Garbus-Below, under the authority of this Court's decision in Crosby, that he should dismiss all of the union's claims since they could pursue those claims to the extent they have them in state court. And that argument is supported by this Court's many decisions that invoke the doctrine of constitutional avoidance. That doctrine provides that when one construction of a statute raises a constitutional question and another does not, the courts will construe the statute to avoid the constitutional question. We raise just such an argument to Judge Garbus. It is discussed on page 45 of our brief, and it's with respect to the question of whether or not the variable benefit increases were a contractual obligation of the City under Article 22, Section 36A, and that the City was not contractually prohibited from prospectively modifying the variable benefit system. Judge Garbus rejected that argument, but he should have construed the provision to avoid the constitutional question. Or he should have abstained from deciding the question in favor of letting the state courts decide the issue first. He did dismiss most of the union's state law claims, but only after incorrectly entertaining the constitutional claims and the state law breach of contract claim that was count three. He could have, and should have, let the state courts decide if Ordinance 10-306 reached any state law contract right held by the plaintiffs. Because if it did not, then there can be no constitutional violation, since their contracts could not be impaired if the city had the right under state law to modify the contracts in the fashion in which it did. Did the city raise any affirmative defenses that would have extinguished their right to recover under the state law contract? No, there's nothing in the ordinance that forecloses any party from going to state court. So I don't believe there is any impediment from them going to state court. That's not the same thing as saying they would have been successful in state court, because our position is they would not have been. But there's nothing that foreclosed the avenue for our remedy. That brings me to the question that the trial court did decide. The district court correctly found that the city faced, since 2008, successive and worsening budget deficits. Deficits that the city addressed over the years by hiring freezes, pay freezes, unpaid furloughs, layoffs, deferring needed infrastructure repairs, reducing trash pickup, cutting library hours, a long list of painful cuts year after year addressing the city's financial problems. Most telling, I think, is the cut that they made rotating firehouse closures. I think when you get to the point that you are rotating firehouse closures, you are getting to the end of the line. I think that this court's decision in Baltimore Teachers, which I think is on all fours with this case, said it best when it said that what was occurring in Baltimore Teachers and what's happening here, I suggest, was, quote, it was approaching the point where it had to begin cutting basic services and initiating the breakdown of government. As the district court found, unanticipated revenue shortfalls, extraordinary snow removal costs, required additional budget cuts in 2010 on top of a $100 million deficit faced by the city and a $65 million per year additional cost that was imposed by the dragging fiscal anchor that was the variable benefit provision in the pension plan. Against this backdrop, the district court found as fact that the city made the determination that the plan was unsustainably costly, a determination with which the district court agreed, with this plan now approaching, at that point in time, about 50 percent funded on an actuarial basis and dropping. So the city determined that it had to make changes. It was a crisis, and it had no choice. The unions, in fact, agreed. At the hearing before the city council, the union's actuary addressing the city council in the presence of the union members and the union's attorneys told the city council, we know you can't afford this plan. We know you can't afford this benefit, the true cost of which is $65 million a year extra, unbudgeted for, never mind the deficits. So the district court correctly found that the structure of the variable benefit, coupled with the need to reduce the investment assumption from 6.8 percent to 5 percent, led to what he called, quote, the unintended consequences of destabilizing the plan. The court found that an important public purpose would be served by impairment of the plaintiff's contract rights, and it further found that it was reasonable to enact legislation to stabilize the plan by impairing the variable benefit. The court said it deferred to the legislature's decision to impair the contract with the plaintiffs rather than shift the burden to other government programs or to raise taxes. Now, the district court was clearly correct in this regard, both factually and legally, but having found that there was a legitimate public purpose that was being served by the ordinance and that it was reasonable and necessary to impair the contract pursuit of the public welfare, the court went off the rails and then substituted its own judgment for that of the legislature on how the city should structure the replacement COLA that needed to be replaced. The variable benefit, everybody agreed, needed to be replaced. But where he differed was he said you should have done a different replacement COLA with the limited money that was available to fund it. The court did not, as it should have, recognize that once it made the determination that the city was not considering impairing its contract, as this court said in Baltimore Teachers, on a par with other legislative options, that it was not doing that. Once he made that determination, it was his duty to give deference to the legislative determination as to how to fix it. The court was obliged to defer to the legislative decision on how best to distribute the limited funds that were available to replace the variable benefit. The mayor and the administrator for the fund both testified as to the rationale for the tiered COLA. The city knew it had limited funds. It could have passed a COLA that would have been a 1% across the board COLA to all of the members. That clearly is what the district court preferred. But that would have disproportionately placed the impact of the change from the variable benefit to the new COLA on the backs of the oldest and most vulnerable members of the plan, those over the age of 65. The city recognized that the plan offered the extraordinary opportunity, not available to hardly any of our citizens today, to beneficiaries to retire at a very young age. Some of these plan members can retire if they choose in their 40s or in their 50s with extensive benefits. And if those retirees, retiring in their 40s or 50s, want protection against an increase in the cost of living, they have the ability to take a second job, an ability that was not shared by most of the over 65 retirees. Moreover, the older retirees had not shared in the much more generous recent contracts negotiated on their behalf by the unions, or the incredibly lucrative drop program that was extensively discussed with the district court. A program that allowed one of the named plaintiffs in this case, one of the named plaintiffs in this case, retired at the age of 58 on 80% of his salary and received under the drop program a check from the city for more than $200,000. That's pretty good protection against inflation. And that right, that drop program, was not available for almost any of the over 65s because it was not instituted at the time that they were in service. So the city council and the mayor knew that those over 65s were the ones who did not have that benefit. The district court thought there was some unfairness about not spreading the COLA out equally over time. He thought all beneficiaries should get the same COLA at the same time. But there is no constitutional right that I can find to having a COLA timed equally. Every plan member has the same right in this plan under the current ordinance to get a 2% COLA when they reach the age of 65. No one is discriminated against. The city has simply made the policy decision to maximize COLA protection for the retirees' later years. But every 45-year-old in the plan who retires will receive the 2% COLA once they achieve the age of 65. And it is worth noting that the city gets no benefit by choosing this tiered COLA over the flat COLA that the district court clearly preferred. Because the cost is the same. The actuary determines how much it costs to have a 1% or 1.3% COLA that is spread out equally among everyone. It's the same charge as the tiered COLA they have. It's the same amount of money. So the city has no interest, one way or the other, saying it benefits the city to pick one or the other. They picked it because they were trying to protect the older retirees. The district court felt it was bad policy, but he could cite no case law for his ipsy-dixit conclusion that the policy was unconstitutional. He failed to heed this court's admonition in Baltimore Teachers. A case, again, I think is on all fours, that the courts should not sit as a super legislature. The courts are not equipped to make the policy decisions that the legislators are entrusted with. And as this court said, then, and as applies here, such determinations are for the legislature and not the judiciary. In my remaining one minute that I reserve, let me just quickly deal with a substantial impairment question. That question, I think, is governed by this court's decision in City of Charleston. Factors were laid out by Judge Motzen in that case, and you can read through the factors. I think if you apply each and every factor that Judge Motzen listed in the City of Charleston for whether or not an impairment of a contract is substantial under the constitutional case law, what you will find is that in each circumstance, the unions are unable to show that the contract was, in fact, substantially impaired. You have questions like, was there a reasonable reliance on the part of the plan members on the abridged term? Here, what we had was a variable benefit, which nobody could rely on for any given year that it was going to produce anything, because in order to do that, you would have to be able to time the market. You would have to know when the market was going to go over 7.5%. Having done that, and if I could, I'll just move in a little bit of the time I reserve just to complete the point here. There could be no reasonable reliance. The second factor is whether or not the area impacted was a regulated one. Clearly, this was. There's a reserve of legislative power to make changes to government pension plans. The third is whether the contract was abolished or merely modified. Clearly, the contract here was modified. The fourth is whether or not the abridged term was central to the case or whether or not it was one of the central undertakings. Here, it's a COLA. It's not the basic benefit. It is even what the plaintiffs called an enhancement. And the final factor is whether or not it was replaced by an arguably comparable provision. Not the same provision, not the exact same amount, but an arguably comparable provision. It clearly was. It was replaced by a guaranteed flat-tiered COLA replaced an unpredictable and not guaranteed variable benefit. We think the plaintiffs could not prove substantial impairment, and for that reason, the district court's decision should be reversed as well. Thank you. With the court's permission, I will reserve the rest of my time to respond to the union's appeal and for rebuttal. Thank you. Mr. Monk. Good morning, Your Honors. May it please the court. Charles Monk on behalf of the police officers and firefighters unions and the individual named plaintiffs. I will be addressing the city's appeal and the contract and taking clause issues, particularly as those issues relate to what we call the federal claims class, which are that group of plaintiffs here who had already retired from service and had done everything that the city had requested of them in order to entitle them to the pension that they believed they had a right to have. Mr. Klausner will address our appeal and whether the court below erred in failing to interpret Section 42 of the Baltimore City Code. You'll remember that's the provision which says that the city promises, once you become a member of the plan, that it will not diminish or impair its pension promise so long as you're employed by the city. And we will both, of course, be happy to answer any questions you have. Baltimore City has attempted to do something that, frankly, we can find no other circumstance, save bankruptcy, that a city has tried to do. They tried to take away from retired persons, after they had done their service and completed what the city requested of them, the benefit of their bargain, the terms of their pension promise. In this particular case, Baltimore City had adopted in 1983 a variable benefit provision, which was really designed to address the fact that in those days we had extraordinary interest rates and the city wanted to assist its retirees dealing with the ravage of inflation over their pensions. Rather than adopt the COLA, the city chose this gain-sharing mechanism that we call the variable benefit, and it's simply a sharing of the success of the investment in the plan. Of course, every year that success didn't meet the thresholds, and so in some years the retirees' benefits were enhanced. In some years they were not. The evidence showed that over the 26 years since 1983, on average, the increase had been about 3% a year. So from the retirees' perspective, and counsel makes the point that this was not central to the retirees' interest, but of course it was. One named plaintiff in this case, 40% of his current pension payment was a result of the enhancements that the variable benefit had produced to his basic pension benefit over the years. This is not a case where pensions are exorbitant. The average pension in this case, the evidence showed, was $34,000. And police officers and firefighters do not get Social Security. So this is their retirement benefit that was offered to them by Baltimore City, which they worked to receive. Let me address, if I could, your questions that you presented to us. First, we do not believe that there is an adequate remedy here for breach of contract. The city has taken the position that it has the police power to go in and modify the contract without having to pay damages for doing so. Frankly, if that is this contract, then there is no contract here, because the city could, whenever it chose to do so, whenever it decided it was in its interest to do so, it could come in and modify the contract. Baltimore City is not like Detroit. Baltimore City is not facing bankruptcy. And clearly, Asbury Park, maybe in that Supreme Court case, in that unique circumstance where it was akin to a bankruptcy circumstance, is the only case we can think of where a court has found, consistent with the contract clause, the ability of a city to go in and reduce its financial obligations. This pension contract, with respect to the retirees, is no different than a bond contract that the city might have entered into. The pensioners have made their contribution. They've done their 20 or 30 years working for the police department and fire department in Baltimore. They've contributed their dollars to the plan. After that 20 or 30 years is over, they've retired. They've done what the city asked. That's just like the bondholder who walks in and hands the city a check and says, here's my money, I expect to get paid out over 30 years in return. The city has chosen here to go in and try to eliminate or modify that financial obligation in a dramatic and material way, and there's no evidence in this case that the 0-1-2 COLA that the city offered in return was the same or a similar benefit to what the variable benefit produced over time. Indeed, the evidence was that this ordinance was rushed to a decision by June 30, because as of July 1, the pensioners in Baltimore City would have been entitled to a 4.5% increase in their pension, where if they were less than 55 years old, they would get zero under this statutory change. That's clearly a material change for those pensioners. We have a significant disagreement with the city over what the state law provides here. We believe that the state law is clear that once you have retired, once you've done everything called upon for you to do, the state is obligated to live up to their contract and cannot modify it unless the state provides the same or a better benefit to you. The state clearly did not provide the same or a better benefit here, and so we believe that Maryland law is clear, and that's both Saxton and Quinn, that once you've retired, you're in a different position. That's once the contingency has taken place. There may be a different story, and that's how Section 42 of the code comes into play here for someone who is still employed by the city, still working towards that moment when they get to retirement or they get to the right to retire. But with respect to retirees, they've done everything they've called upon, and the contingency has been satisfied. Well, I still haven't heard, though, why you don't have a breach of contract remedy in state court. You can still argue exactly what you've said to us today, can't you, as the basis for a very robust breach of contract claim? I mean, then the state court would have to decide. Your Honor, we certainly can make those arguments, and at the same time we're faced with the local government saying that they have the governmental power to eliminate those obligations and walk away from their financial obligation. I think the real question that you're asking is whether this court should hold off in deciding the state law questions. Obviously, the district court chose not to exercise the supplemental jurisdiction. But whether you should hold off deciding the constitutional question and let this matter go back to state court and have the state court decide the contract question. And my answer to you is I don't believe I have an adequate remedy, but even if I did have an adequate remedy, I think I have the right under Wisconsin v. Constantine to come to you and ask you to decide the constitutional questions because I have a right to have my constitutional rights enforced, or my clients do. And in this case, we're not dealing with an ambiguity of state law, at least with respect to the people who have retired. I think the city has an argument, and my colleague is going to address that question of how Section 42 of the statute might apply to the people who are active. But for retirees, I think there's a dispute under state law. So I don't think you're in a Pullman abstention circumstance. And therefore, I believe that the district court was right when he concluded this modification, this abolition of the variable benefit that the city undertook here by this statute was a violation of the Contracts Clause. I think it's appropriate for the federal court to enforce the Contracts Clause in that way. It's important to understand, I think, in your thinking about this case, that Baltimore City is not saying that it's bankrupt. There's a lot of rhetoric, and counsel argues, well, we cut our certain benefits that we were providing to the city, but the evidence showed that Baltimore City, in the month in which they made this modification to the statute, was rated AA- as a bond payer. So that's the marketplace telling us that the city of Baltimore is in good financial health. Not just okay financial health, but good financial health. Baltimore City was not like Detroit in that the state had not assigned a manager to run its financial affairs. Baltimore City always paid its debts on time. Baltimore City had a rainy day fund with $80 to $100 million in it. Baltimore City carried a fund balance at the end of the year. Baltimore City adopted a budget in which it left vacant positions that were funded in the budget. These are not indicia of a city that is in such desperate financial shape that it cannot live up to its financial obligations, which is what Baltimore City has chosen to do here. And I might suggest to you that it's a very... When you think about the pension obligation provided to retirees, that is so akin... that is a financial obligation. It's not a contingent obligation. And what Baltimore City chose to do was spend the money elsewhere. The record is very clear that Baltimore City had other... had other ability to make financial decisions. What it didn't want to do was live up to the promise that it made way back in 1983, when Mayor Schaefer said, we're going to try this gain-sharing mechanism to take care of the issue associated with inflation impacting our pensions for our police officers and our firefighters. Let me ask you this. What keeps you from going to state court to seek vindication of every wrong you've told us about that occurred to your clients? Your Honor, we certainly... The state court certainly can decide the constitutional questions. I understand that. And the contract question. Right. I give you two answers to that question. One is I have the right, I believe, under federal question jurisdiction to go to federal court and seek the protection of federal law. My second answer is I think it would be unfair to ask Baltimore City, the judges of the Baltimore City Circuit Court, to undertake this issue. And I have a great deal of respect for those judges. But let's face it, this is a highly politically charged issue in Baltimore City in the papers every day. And with all due respect, that's why we have federal courts is the opportunity to get above that emotional circumstance and enforce a federal law. And I have a federal right, I believe, to have the contracts clause applied to these circumstances. I think the court below got it right when he concluded that this was a contract that had been materially breached and that it had been retroactively breached, certainly with respect to the retirees. I think he got it wrong when he said, well, and the corollary to that was, well, it isn't a taking. Well, of course it's a taking. If I went into the bondholder and I said, I know I agreed to pay you 15% on your money when interest rates were high, but I'd really like to only pay you 5% now because 15% is getting pretty expensive for me, we would say that that was a taking or that difference in the city trying to modify its contract that way. That's what they did here for these pensioners. They went in and changed the benefit and removed a substantial gain-sharing mechanism that had served these pensioners well over time. But equally, as you have a right to seek relief in federal court, we have a right to avoid that constitutional question if you've got remedies elsewhere. Your Honor, I think under the Wisconsin v. Constantine decision, you do in the circumstance where we have a Pullman extension question and to the extent that there is an uncertainty in state law, but I don't think there's an uncertainty in state law when it comes to the retirees' circumstances. There may be an argument, as I've said, that there's some uncertainty with respect to how Section 42 should be applied here for the actives, but I think with respect to the retirees, the ball has to be in your court, and I think that's what the Supreme Court said in the Constantine decision. This is... In just the few seconds I have left, let me just say again. This is not... We're not... Baltimore City's not Detroit. They're not asking a court to reduce all of their obligations uniformly. They are picking on a particular kind of obligation. And counsel makes the argument that the pension was in trouble, but pensions get in trouble when cities don't make their contributions as they go. So we face the situation, which is really a slippery slope, that we go around in a circle. I don't make enough of a contribution, so the pension plan is not actually sound, and therefore I can go in and I can take away the benefits. I don't think that is living up to your contractual obligations. I believe my time has expired. Thank you. Mr. Klausner. Good morning, Your Honors. May it please the Court. Robert Klausner, representing the cross-appellants, the active employees of the city. Article 22, Section 42 of the Baltimore City Code says when you become a firefighter or a police officer and you join the plan, which is a condition of employment, you enter into a contract with the mayor and city council, the city of Baltimore, and that that contract says... Your contract is the terms and provisions of all of Article 22, which is when you can retire, how much you get, and all of those terms. And it's whatever it is on the effective date when you adopted this ordinance back in the 60s or the day you enter work, whichever is later, and the benefits provided thereunder shall not, quote, in any way be diminished or impaired. 10-306, excuse me, materially reduced or impaired, the record shows that the active employees essentially had a 20% reduction in the lifetime value of their benefits. The city used its legislative power to rewrite the contract. That's something it cannot do. It gave that power up with regard to each person that they hired. And Mr. Ulrich spoke about reserved power. The reserved power law says a government does have certain reserved powers except where those reserved powers come into conflict with the Constitution. When Maryland joined the union, one of the things it gave up was the ability to impair its contracts legislatively. Compare Gastonia. In Crosby, a case decided by this court, there was no legislative action by the city of Gastonia. In fact, the overarching lesson from that case is, good or bad, you get the deal that you made. And the police officers on that supplemental plan in Gastonia made a deal that said, we can't come to the city for any more money. If it runs out, we get what's in the plan. But Crosby also said that if there is a remedy for breach of contract, there's no contract clause violation. That is correct, Your Honor. He said it very plainly. It is, Your Honor, but there is no state law remedy here, and here is why. For what? I was going to say, there is no state law remedy, and with the court's permission, I'd like to explain why. The city says, we can make a contract, and we can change the contract whenever we want within our reserved power. So therefore, it's a nullity. It's not a contract at all. And more than that, they use their legislative power to change the contract. In essence, if 10-306 is not a constitutional impairment, the city's following the new ordinance that it wrote. It's just an impairment of the contract that these police officers and firefighters made when they entered the service of the city. The city had the absolute right to change it for the person who will come here tomorrow. And that's why, in the other cases that the city cites to about the law in Maryland, we cited to, on page 50 of the brief, we cited it to the Baltimore County Pension Code and the Anne Arundel County Pension Code. And it's important, because just as Baltimore City, in Section 42, says it's a contract that shall not be diminished or impaired, Anne Arundel County and Baltimore County have a provision that says, if we need to, we may prospectively reduce the benefit. Secondly... Mr. Foster, I hate to interrupt you, but I didn't follow your explanation of why there's no remedy in state court. Can you run through that one more time? Yes, Judge. The reason is because the city says we have the power to alter this contract. The city says in its brief, if they didn't pay the money, if they didn't pay a benefit, that would be a breach of the contract. What they're saying is, we can't possibly have a breach of contract because we have the power to change the contract whenever we want. And as long as we're paying in accordance with the contract, the way we keep rewriting it... They're not saying that there is no contract. That's exactly what they're saying. Yet, we believe that there is a contract. The law of Maryland says it. And as the Supreme Court said in Romine, and I think as this Court said in Kessler, even though there may be a state remedy, it's an abdication of the federal court's responsibility to interpret the Constitution. Maryland is one of the few states without an impairment clause in its state Constitution. It would end up interpreting the federal Constitution, which we believe is here. Judge Garbus gave no effect to Article 42. You should send it back and say, Judge Garbus, do the same reasonable and necessary analysis that you did with regard to the variable benefit with regard to that section. I'll reserve the rest of my time for rebuttal. Thank you, Your Honors. Thank you. Mr. Alwy. Thank you. Let me address first Mr. Monk's comments and then speak to Mr. Klausner's. Mr. Monk started by telling you that Baltimore City had tried to do something that no other city had done, and that's just not correct. This Court's decision in Baltimore Teachers is directly on point. A circumstance where this Court found that Baltimore City had impaired its contracts with its teachers and police officers because of a fiscal crisis that occurred at that point in time in the early 90s, and found that it was reasonable and necessary for the city to do so because of the fiscal circumstances. The city wasn't in bankruptcy then and wasn't alleged to be in bankruptcy. And the point is that the city, in order to exercise the reserved police power that it has, that the cases all say are paramount for the public welfare, doesn't have to let the circumstances get to a Detroit situation where you actually are in bankruptcy. There is no case that says you have to let the case go as far as the city goes into bankruptcy. In fact, it says the opposite. The variable benefit that Mr. Monk cites, told you that it made on average 3%, well, that's over the entire life of the variable benefit. Most of that 3%, to the extent you average it out, occurred in the first 10 years or so of the life of the variable benefit. If you were a retiree who retired in the 2000s, you were probably receiving something a lot closer to 1%, which was the rate an employee would have received from a COLA, making how much you received as COLA protection dependent upon when you retired, which is really not very much different than what Judge Garbus found was wrong with the tiered COLA system. Does the city dispute that Section 29 of your code creates a binding contract between the city and the public safety officers? What the city... And the follow-up question would be, if you say yes, then are they wrong in their assertion that you can use your reserve powers to do whatever you want? I think the distinction here, if I can answer your honest question, is between having a defense to a contract and having the right to contest that defense in state court. The city maintains for a variety of reasons that under certain circumstances, it has the right to modify the pension plans that are at issue here under state law, and I cite you the Quinn case, which specifically says that it has such a right. But that doesn't foreclose, like the plaintiff in the Quinn case who sued the city of Frederick in state court to obtain the benefits he said he was entitled to, they have access to the state courts to make that claim. The city may, depending upon what the claim is that is presented to the state courts, defend and say, at least for what you're asking for right there, you don't have a contractual right to that. That is completely different than saying you don't have the right to make your claim in state court that you do. So I would draw a distinction between a defense to the contract that the city maintains that it has and a claim that there is no jurisdiction in the state court to hear this issue.  to hear the issue. So let me address a couple of more things that Mr. Monk mentioned. He, in his arguments to you, most of what his argument to you is a disagreement with the facts found by the district court without any attempt to show that the district court was clearly erroneous in his factual findings. Because the district court found that there was good and sufficient reasons to change the variable benefit, found that there was a fiscal crisis, found that the city wasn't placing its policy considerations ahead of its obligations to make the payments to the plaintiffs. What it found was that there really wasn't any choice, that they had to make the change. In fact, in the city council, what's somewhat ironic, is in the city council, the lawyers for the unions came in and told the city council that they recognized that the variable benefit was a problem and had to go. And the only question was, what was it to be replaced with? The unions wanted it to be replaced with a 2% COLA, and the city said, we can't afford a 2% COLA. And the district court, when confronted with the same argument, agreed with the city, that the city could not afford a 2% COLA. And that was really the guts of the disagreement. The case that I think establishes the parameters of the state court rights here is the Quinn case. And what the Quinn case said, to be clear, on what the city's position is about what the state law says, what the Quinn case said, and this goes to the Section 42 argument that Mr. Klausner made as well. Mr. Klausner says, here's Section 42. It says you can't make any changes. Well, Section 42 was enacted at a time that was before the Quinn decision. And when you read the Quinn decision, what you will see is that the Court of Special Appeals of Maryland, in that case, was confronted first with the question of, is a pension a gratuity, a mere gratuity, or is it a contract? Because at the time that the court was addressing that question, that was an open issue in Maryland. Is it a mere gratuity? And if they had held that it was a mere gratuity under state law, you might be able to make an argument, I suppose, that, well, you had no recourse to state courts. What the court found was that it said it's not a gratuity. They rejected the mere gratuity line of cases and chose instead to say that it is a contract. However, a contract that is not a strict contract is a contract with a reserved provision for the state to say that where it is necessary for the public welfare to make a modification, you can do so, provided that you provide either the same or substantially the same, not exactly the same, but substantially the same benefits in replacement, or there are countervailing public welfare equities that balance the scale. And so there is a contract, reach of contract claim that one can make in state court, and the district court should have, even if there is a constitutional claim that can be made in federal court, the district court should have said those issues should first be decided by the state courts as opposed to my deciding them myself. If the court has any further questions, I thank you, court, for the time. Thank you, Mr. Olick. Mr. Klosner, you have some time remaining. I'd ask the court to take a look at page 12 of the brief, Joint Appendix 1826, where Judge Garbus said they could come up with the money if they had to. Judge Keene, I want to go back to your question about Crosby, and I looked at it while I was sitting there. This court found in Crosby that it wasn't a 1983 case. I don't believe, and I misspoke to the extent that I said it dealt with a state remedy. The court went on to decide that they didn't have a good breach of contract case, but this court rejected a 1983 claim based on an earlier decision of the U.S. Supreme Court. So I've been misspoke on that. I wanted to clarify the record. Baltimore Teachers was a temporary remedy that went away at the earliest possible date, and it was the least intrusive means possible. That clearly was not the case here. Quinn says... Quinn spoke about the City of Frederick's plan. Baker says that the governing contract is what governs the case that you have before you. The case you have before you is a city that has a contract that even after Quinn decided not to change it. They decided to leave Section 42 in place, notwithstanding all the case decisions. And I think the reason's pretty clear. More police officers and firefighters have died in the service of the City of Baltimore than all the rest of Maryland put together in order to get people to come there and stay there and work there. They had to offer a deal that said, you are secure the day you walk in the door. Because having worked in police departments myself, you can die on the first day or the last day. Or maybe you make it to retirement when it is even more egregious to punish those that are old by taking. And that's exactly what the city did. It took the variable benefit. With regard to the active members, you should send the case back to Judge Garbus with instructions to do the reasonable and necessary analysis as to what he called the pre-eligible group. And I would ask you to also order him to reinstate the takings claim. Unless there are questions, I thank the Court for its attention.
judges: William B. Traxler, Jr., Barbara Milano Keenan, Henry F. Floyd